IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

CLETUS F. JOHNSON,

Petitioner,

vs.

JERRY BURT, Warden,

Respondent.

No. C05-2081

REPORT AND RECOMMENDATION

————————————————

**TABLE OF CONTENTS**

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II. PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *A. First Trial* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *B. First Direct Appeal* . . . . . . . . . . . . . . . . . . . . . . . . . 4
    *C. Second Trial* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    *D. Second Direct Appeal* . . . . . . . . . . . . . . . . . . . . . . . . 4
    *E. State Application for Post-Conviction Relief* . . . . . . . . . . . . . . . . . . 5
    *F. Federal Application for a Writ of Habeas Corpus* . . . . . . . . . . . . . . . 6

*III. FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    *A. Factual Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    *B. Epps' Trial Testimony* . . . . . . . . . . . . . . . . . . . . . . . . . 8
    *C. Worth's Trial Testimony.* . . . . . . . . . . . . . . . . . . . . . . . . 10
    *D. Nosko's Trial Testimony.* . . . . . . . . . . . . . . . . . . . . . . . . 13

*IV. STANDARDS OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    *A. Standard of Review under 28 U.S.C. § 2254(d)(1)* . . . . . . . . . . . . . 16
    *B. Standard of Review under 28 U.S.C. § 2254(d)(2)* . . . . . . . . . . . . . 18
    *C. Exhaustion Requirement* . . . . . . . . . . . . . . . . . . . . . . . . . 19

*V. DISCUSSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    *A. Ineffective Assistance of Counsel* . . . . . . . . . . . . . . . . . . . . 21
        *1. Ineffective Assistance—Statements of Troy Redd* . . . . . . . . . . 23

2. *Ineffective Assistance—Prosecutorial Misconduct* . . . . . . . . . . 27
a. *Prosecutor's closing argument.* . . . . . . . . . . . . . . . . . 27
i. *Worth's rape allegation.* . . . . . . . . . . . . . . . . . 30
ii. *Credibility of Larsie Epps as a witness.* . . . . . . . . 31
b. *Prosecutor's use of Larsie Epps as a State witness.* . . . . . 32
B. *Equal Protection Violation—Jury Selection* . . . . . . . . . . . . . . . . . 34
C. *Due Process Violation—Use of Larsie Epps as a State Witness* . . . . . . 37

VI. *CERTIFICATE OF APPEALABILITY* . . . . . . . . . . . . . . . . . . . . . . . 39

VII. *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

VIII. *RECOMMENDATION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## I. INTRODUCTION

On May 19, 2003, Petitioner, Cletus F. Johnson ("Johnson"), submitted an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (*See Johnson v. Ault*, Case No. C03-2024-LRR.) On August 20, 2003, however, Johnson voluntarily dismissed his application for a writ of habeas corpus without prejudice, in order to completely exhaust all of his state law claims through an application for postconviction relief in the Iowa District Court for Black Hawk County. After the Iowa District Court for Black Hawk County dismissed his application for postconviction relief and the Iowa Court of Appeals affirmed the dismissal, Johnson filed a motion to reinstate the application for a writ of habeas corpus on September 6, 2005. On September 13, 2005, Respondent filed a resistance to Johnson's motion to reinstate habeas corpus proceedings. On September 20, 2005, in the alternative to reinstating the application for a writ of habeas corpus that he originally filed on May 19, 2003, Johnson filed a motion to assign a new case number to the previously filed application. The Court entered an Order on November 15, 2005, denying Johnson's motion for reinstatement of the application for a writ of habeas corpus, but granting his motion to assign a new case number to the previously filed application. Johnson filed the instant application for a writ of habeas corpus on December

2

1, 2005.[1] On May 22, 2007, Chief Judge Linda R. Reade referred this matter to the undersigned for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

In his application, Johnson challenges the legality of his convictions for first-degree burglary, in violation of Iowa Code section 713.3, and first-degree robbery, in violation of Iowa Code section 711.2. This matter is before the Court on Johnson's brief regarding his application for a writ of habeas corpus (docket number 29), Respondent's brief (docket number 34), and Johnson's reply brief (docket number 35).

## II. PROCEDURAL BACKGROUND

### A. First Trial

On April 10, 1998, Johnson was charged by trial information in the Iowa District Court for Black Hawk County with first-degree burglary, in violation of Iowa Code section 713.3 (Count I); first-degree robbery, in violation of Iowa Code section 711.2 (Count II); terrorism, in violation of Iowa Code section 708.6 (Count III); and delivery of a controlled substance, in violation of Iowa Code section 124.401(1) (Count IV). *State v. Johnson*, No. FECR078062 (Black Hawk County Dist. Ct. 1998).[2] On May 12, 1998, the State of Iowa ("State") filed a motion to consolidate Johnson's case with Troy Redd, who was commonly charged with burglary, robbery, and terrorism. On May 26, 1998, Johnson filed a motion to sever Count III (terrorism) from Counts I, II, and IV and to order separate trials for Count III and Counts I, II, and IV. On May 28, 1998, the Iowa District Court for Black Hawk County filed an Order granting the State's motion to consolidate and Johnson's motion to sever. On October 30, 1998, Johnson and Redd proceeded to trial.

---

[1] John Ault was replaced by Jerry Burt as Warden at the Iowa State Penitentiary in Anamosa, and Burt was substituted as Respondent. (*See* docket numbers 21 and 23.)

[2] Iowa state court criminal and civil records may be accessed at the following address: www.judicial.state.ia.us/Online_Court_Services/. *See Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005) (addressing the court's ability to take judicial notice of public records).

On November 4, 1998, the jury found Johnson guilty of first-degree burglary, first-degree robbery, and delivery of a controlled substance. On March 8, 1999, the Iowa District Court for Black Hawk County sentenced Johnson to indeterminate prison terms not to exceed 25 years for the first-degree burglary conviction, 25 years for the first-degree robbery conviction, and 10 years imprisonment for the delivery of a controlled substance conviction, with the sentences to run concurrently.

## B. First Direct Appeal

On April 5, 1999, Johnson filed a notice of appeal. On appeal, Johnson argued that he was denied a fair trial by the State's improper use of prior bad acts evidence under IOWA R. EVID. 404(b). On November 20, 2000, the Iowa Court of Appeals reversed and remanded Johnson's case for a new trial. *State v. Johnson*, No. 99-0557, 2000 WL 1724871 (Iowa Ct. App. 2000). Procedendo issued on December 22, 2000.

## C. Second Trial

Johnson's second trial on the same charges (first-degree burglary, first-degree robbery, and delivery of a controlled substance) commenced on April 17, 2001. At the conclusion of the evidence, the Iowa District Court for Black Hawk County dismissed the delivery of a controlled substance charge pursuant to Johnson's motion for judgment of acquittal. On April 20, 2001, the jury returned guilty verdicts for first-degree burglary and first-degree robbery. On May 10, 2001, the Iowa District Court for Black Hawk County sentenced Johnson to indeterminate prison terms not to exceed 25 years for the first-degree burglary conviction and 25 years for the first-degree robbery conviction, and ordered the sentences to run concurrently.

## D. Second Direct Appeal

On June 4, 2001, Johnson filed a notice of appeal. On appeal, Johnson argued that: (1) the trial Court erred when it allowed into evidence allegations about irrelevant and prejudicial sexual conduct; (2) the record contained insufficient evidence to support his conviction; (3) the prosecutor improperly introduced false evidence and improperly

4

impeached State's witness Larsie Epps by asking her about her drug use and implying that she was in on a plot to sexually abuse Rebecca Worth; (4) his trial counsel provided ineffective assistance; (5) the trial Court erred by overruling his *Batson* challenge; and (6) the trial Court erred in ordering him to pay restitution from his first trial. On January 15, 2003, the Iowa Court of Appeals affirmed Johnson's convictions.[3] *State v. Johnson*, No. 01-0889, 2003 WL 118212 (Iowa Ct. App. 2003). On February 3, 2003, Johnson filed an application for further review, and, on April 18, 2003, the Iowa Supreme Court denied such application. Procedendo issued on April 28, 2003.

### E. State Application for Post-Conviction Relief

On September 5, 2003, Johnson filed an application for postconviction relief pursuant to Iowa Code chapter 822 in the Iowa District Court for Black Hawk County. *Johnson v. State*, No. PCCV091856 (Black Hawk County Dist. Ct. 2003). In his application for postconviction relief, Johnson argued that he was denied a fair trial, his right to fundamental fairness, and due process of law because of the misconduct of the prosecutor in his second trial. On August 11, 2004, the State filed a motion to dismiss Johnson's application for postconviction relief. On August 16, 2004, the Iowa District Court for Black Hawk County granted the State's motion to dismiss. Johnson filed a motion to reconsider the dismissal, which was also denied.

On September 14, 2004, Johnson filed a notice of appeal. On July 13, 2005, the Iowa Court of Appeals affirmed the dismissal of Johnson's application for post-conviction relief. *Johnson v. State*, No. 04-1486, 2005 WL 1630810 (Iowa Ct. App. 2005). Procedendo issued on August 24, 2005.

---

[3] The Iowa Court of Appeals vacated the restitution ruling and remanded that issue for the Iowa District Court for Black Hawk County's consideration. Restitution is not at issue in Johnson's application for a writ of habeas corpus; and therefore, the Court need not address this issue.

## F. Federal Application for a Writ of Habeas Corpus

On December 1, 2005, Johnson filed the instant application for a writ of habeas corpus. In his application, Johnson asserts the following grounds for relief: (1) a violation of the Sixth and Fourteenth Amendments occurred because trial counsel provided ineffective assistance when he failed to object under the Confrontation Clause of the Sixth Amendment to Rebecca Worth's trial testimony regarding statements made by Troy Redd; (2) a violation of the Sixth and Fourteenth Amendments occurred because trial counsel provided ineffective assistance when he failed to move for a mistrial for prosecutorial misconduct; (3) a violation of the Sixth and Fourteenth Amendments occurred because trial counsel provided ineffective assistance when he failed to object to prosecutorial misconduct relating to the State's use of Larsie Epps as a State witness; (4) a violation of the Sixth and Fourteenth Amendments occurred because trial counsel provided ineffective assistance when he failed to object, on inadmissible hearsay grounds, to two written statements prepared by Rebecca Worth which were entered into evidence; (5) a violation of his right to equal protection under the Fourteenth Amendment occurred during jury selection; (6) a violation of the Fifth and Fourteenth Amendments occurred because his due process right to a fair trial was violated by the prosecutor's use of Larsie Epps as a State witness; (7) a violation of the Fourteenth Amendment occurred because the State failed to prove every element of burglary and robbery beyond a reasonable doubt; and (8) a violation of the Sixth and Fourteenth Amendments occurred because trial and appellate counsel provided ineffective assistance when they failed to object to the State's reference to rape allegations as violating his due process right to a fair trial under the Fifth and Fourteenth Amendments.[4]

---

[4] On January 26, 2006, Respondent filed a "Motion for More Definite Statement of Habeas Claims" (docket number 9). On April 19, 2006, the Court granted this motion (docket number 15). On June 16, 2006, Johnson filed his "Response to Motion for More Definite Statement" (docket number 19). On June 22, 2006, Respondent filed an answer
(continued...)

On January 26, 2006, Respondent filed relevant state court documents. On June 22, 2006, Respondent filed an answer to Johnson's application for a writ of habeas corpus. On October 31, 2006, Johnson filed a brief on the merits. On November 1, 2006, Johnson filed a supplement to his brief on the merits. On January 2, 2007, Respondent filed its responsive brief. On January 16, 2007, Johnson filed a reply brief.

## III. FACTUAL BACKGROUND

### A. Factual Summary

The facts and evidence are viewed in the light most favorable to the verdict. *See Hendricks v. Lock*, 238 F.3d 985, 986 (8th Cir. 2001); *Copeland v. Washington*, 232 F.3d 969, 971 (8th Cir. 2000). In *State v. Johnson*, No. 01-0889, 2003 WL 118212 (Iowa Ct. App. 2003), the Iowa Court of Appeals summarized the facts of this case as follows:

> On March 21, 1998, Rebecca Worth and Lorsie [sic] Epps went to The Jet, a bar in Waterloo. There they met Johnson and codefendant Troy Redd, who returned with them to Epps's apartment. While at Epps's apartment Johnson had sex and smoked a rock of cocaine with Worth. That same evening, Worth's boyfriend, Shawn Nosko, confronted Worth when he saw her standing arm in arm with Johnson and Redd in Epps's apartment. After an angry exchange with Worth, Nosko returned to an adjacent apartment he shared with Worth. Worth also returned to the apartment. Redd then said to Johnson, "Let's go whoop [Nosko's] ass!" Johnson and Redd were admitted into the apartment shared by Nosko and Worth based on an understanding that they wanted to speak with Nosko for "five seconds." Johnson and Redd entered the apartment with a gun. Johnson and Redd fought with Nosko.

---

[4] (...continued)

to Johnson's response (docket number 20). In its answer, Respondent asserts that Johnson preserved grounds 1, 2, 3, 5, and 6 listed above for the instant application for a writ of habeas corpus. The Respondent further asserts that grounds 4, 7, and 8 listed above are "procedurally defaulted because they were not 'fairly presented' to the Iowa courts as federal constitutional claims." In his Merits Brief, Johnson withdraws arguments 4, 7, and 8 as grounds for granting a writ of habeas corpus. Thus, the Court only addresses grounds 1, 2, 3, 5, and 6 in this Report and Recommendation.

> During the struggle, Nosko told Johnson and Redd to leave.
> During the time Johnson and Redd were in the Nosko-Worth
> apartment, they each held the gun and pointed it at Nosko and
> Worth. Redd pointed the gun at Nosko and demanded all his
> money. After Nosko emptied his pockets, which contained
> only pennies, Johnson and Redd left.

*Id.* at *1. Larsie Epps ("Epps"), Rebecca Worth ("Worth"), and Shawn Nosko ("Nosko") were the principal witnesses for establishing the foregoing factual summary. There are key differences in the trial testimony of Epps, Worth, and Nosko. Therefore, a detailed discussion of each individual's testimony will be provided in turn. Other facts that are significant for making a determination on Johnson's application for a writ of habeas corpus will be discussed, as necessary, in the Court's consideration of the legal issues presented.

### B. Epps' Trial Testimony

Larsie Epps testified substantially as follows: On March 21, 1998, Epps lived in an apartment located at 1013 Lincoln Street in Waterloo, Iowa. Epps began drinking beer that night around 7:00 p.m. Epps' friend, Keith Carey ("Carey") joined her at her apartment around 8:00 p.m. Rebecca Worth, who lived in a neighboring apartment, visited Epps in her apartment around 10:00 p.m. Later in the evening, Worth stated she wanted to go out, and Epps agreed to go out with her. According to Epps, Worth returned to her apartment before leaving, to change her clothes. Worth returned to Epps' apartment wearing a black dress that came above her knees and high-heeled shoes.

Epps and Worth then went to The Jet bar in Waterloo, with Keith Carey driving.[5] When they entered the bar, Epps sat down near the jukebox and Worth went over by the pool table and began talking to Johnson and Troy Redd ("Redd"). Epps testified that Worth sat on Johnson's lap while they talked. After about one hour had passed, Worth told Epps that she wanted to return to Epps' apartment. Epps, Worth, and Johnson exited the bar through a side door, and Redd left the bar through the front door. According to

---

[5] Epps testified that Carey remained in his car in The Jet parking lot, and did not accompany her and Worth into the bar.

Epps, Redd was carrying a shotgun under his coat when he met her, Worth, and Johnson at Carey's car. Carey then drove Epps, Worth, Johnson, and Redd back to Epps' apartment.

Epps, Worth, Johnson, and Redd returned to Epps' apartment around midnight and starting drinking beer in her front room. After about thirty minutes, Worth and Johnson went to Epps' bedroom and had sex. Epps testified that after Worth and Johnson had sex, they smoked rock cocaine. Eventually, Worth and Johnson returned to Epps' front room, where Epps and Redd were drinking beer.

Epps testified that Redd wanted to have sex with Worth, and when Worth said no, Redd became upset. Redd pushed Worth up against the wall and put his arm against her. According to Epps, Shawn Nosko, Worth's boyfriend, entered the apartment when Redd had Worth up against the wall. Nosko became upset, had an angry exchange with Worth, and left the apartment. A few minutes later, Nosko returned to Epps' apartment and asked Redd why he was "trying to talk to his lady," and then left again. Epps testified that Redd sat down on her couch and after a couple of minutes said to Johnson, "Let's go whoop [Nosko's] ass!" According to Epps, when Worth heard Redd's statement, Worth left the apartment and sat in front of Nosko's apartment door in order to keep Redd and Johnson from fighting with Nosko.

Redd and Johnson left Epps' apartment and went to Nosko's apartment. Epps testified that Redd "slid" Worth out of the way in order to enter Nosko's apartment. Epps observed Redd repeatedly punch Nosko while he was inside Nosko's apartment. She also saw Johnson hit Nosko several times. Epps further testified that she saw both Redd and Johnson point Redd's shotgun at Nosko during the confrontation. According to Epps, Redd asked Nosko for his money. Nosko placed his wallet and some change on his dresser. Redd became angry because Nosko had very little money, and he and Johnson repeatedly punched Nosko again.

Epps then left Nosko's apartment and returned to her apartment in order to call 911. After Epps called 911, Carey returned to Epps' apartment. Epps and Carey then went back to Nosko's apartment. Epps testified that she saw a broken window and that Nosko had jumped through the window to get away from Redd and Johnson. Redd and Johnson left Nosko's apartment with Carey before the police arrived.

## C. *Worth's Trial Testimony*.

Rebecca Worth testified substantially as follows: On March 21, 1998, Worth lived in an apartment located at 1013 Lincoln Street in Waterloo, Iowa. She shared the apartment with her boyfriend, Shawn Nosko. Worth and Nosko had lived at the apartment for less than two months. Larsie Epps was one of their neighbors and they shared a bathroom with her.

On March 21, 1998, Worth spent the afternoon and evening visiting her aunt in Independence, Iowa. She returned to her apartment around 9:00 p.m. Worth's aunt gave her a bottle of blackberry brandy, and because Worth did not drink brandy, she decided to give it to Epps. Worth went to Epps' apartment with the brandy and Epps invited her in for a beer. Keith Carey was at the apartment when Worth arrived. Nosko also came to Epps' apartment while they were drinking beer. Worth testified that after drinking one beer with Epps, she, Carey, and Nosko went to Hy-Vee to buy more beer. According to Worth, they purchased a case of beer and a bottle of liquor. They then returned to Epps' apartment and continued to drink alcohol. Worth testified that Nosko had one beer and a shot of liquor. She testified that he got sick and returned to their apartment because he was not feeling well.

According to Worth, after Nosko left, Epps asked her whether she wanted to accompany her to the bars, Old Times or The Jet, in order to find Epps' son-in-law and talk to him about a $500 rent rebate check. Worth agreed to go with Epps and returned to her apartment to change her clothes.

Carey drove Worth and Epps to Old Times. Old Times was packed with people, so they had Carey drive them to The Jet. When they arrived at The Jet, Worth went to the bar to get a glass and Epps went to a booth to sit with Redd and Johnson. After getting a glass from the bar, Worth went to the booth where Epps, Redd, and Johnson were sitting. Worth testified that Epps poured her a glass of beer, but did not introduce her to Redd or Johnson. After drinking half of her glass of beer, Epps told Worth that she wanted to go home. Epps, Worth, Redd, and Johnson then left The Jet through the back door and went to Carey's car.[6]

Worth testified that she sat between Redd and Johnson in the backseat of Carey's car on the way to Epps' apartment. According to Worth, she saw something next to Redd which looked like a gun while they were in the back of Carey's car. When they got back to the apartment, Worth got out of the car and Redd grabbed her arm and told her: "Do not yell, do not scream. I'm not playing with you."[7] Redd kept hold of her arm as they walked into the apartment building and went to Epps' apartment.

Worth testified that once they were inside Epps' apartment, she, Epps, Redd, and Johnson went into Epps' bedroom. While in the bedroom, Redd and Johnson smoked a small, white, aspirin-looking thing[8] in a glass pipe. According to Worth, Epps said that she wanted to smoke the drug as well. Redd and Johnson told Epps that she had to wait until they were "done with [Worth]" before she could have any drugs. Worth also testified that Redd was holding his gun at this time. According to Worth, at this point she was

---

[6] Worth also testified that Carey remained in his car while she and Epps were in The Jet.

[7] *See* Trial Transcript, p. 197, l. 25 - p. 198, l.1.

[8] Redd and Johnson were smoking rock cocaine.

Case 6:05-cv-02081-LRR   Document 38   Filed 07/31/07   Page 11 of 41

crying in the bedroom and Redd told her "to shut up, stop screaming, don't yell. . . . We'll kill you and your boyfriend. You guys don't mean anything to us."[9]

When Redd and Johnson finished smoking the rock cocaine, Johnson pushed Worth down on the bed, lifted up her dress, and had sex with her. She testified that she was crying while this occurred and Redd told her to shut up and that he would kill her because she did not mean anything. According to Worth, Johnson also told her to shut up and stop crying because he and Redd were not going to hurt her. At that point, Epps told Redd and Johnson that Nosko was in the bathroom, and Johnson pulled Worth off the bed and they all went into Epps' living room. Worth testified that Redd told her: "[H]ere's five bucks here. You can't say we raped you. . . . You know, if there's any problems, we're going to shoot both you and [Nosko], your boyfriend."[10] Worth then grabbed both Redd and Johnson's arms and told them that she would leave with them in order to stop them from hurting Nosko. When she, Redd, and Johnson got into the hallway, however, Nosko saw them and, following an angry exchange with Worth, returned to his apartment. According to Worth, she let go of Redd and Johnson and ran inside her apartment in order to explain the situation to Nosko.

Worth testified that when she entered her apartment, she quickly tried to close the door on Redd and Johnson. Redd and Johnson tried to enter the apartment, saying they only wanted to talk to Nosko. Nosko told Worth to let them into the apartment. Worth testified that when Redd and Johnson entered the apartment, they exchanged words with Nosko, and then one of them told Nosko to empty his pockets. Nosko had only sixteen cents in his pockets. According to Worth, this irritated Redd and Johnson and they began fighting with Nosko.

Worth testified that the next thing she knew Redd was on top of her and was trying to have sex with her. She testified that Johnson had the gun at this time and that Nosko

---

[9] See Trial Transcript at p. 201, 1. 13-15.

[10] See Trial Transcript at p. 204, 1. 14-18.

shoved Redd off of her. Then Nosko, Johnson, and Redd began fighting over the gun. According to Worth, Nosko stopped trying to get the gun and that Johnson hit him in the back of the head with it. She testified that, after getting hit in the back of the head, Nosko jumped out of the apartment window. Redd and Johnson then left the apartment to go after Nosko. The police arrived shortly after Redd and Johnson left the apartment. Worth was taken to the hospital to check for any injuries, and then taken to the police station to give a statement about the evening's events.

### D. Nosko's Trial Testimony.

Shawn Nosko testified substantially as follows: On March 21, 1998, Nosko lived in an apartment located at 1013 Lincoln Street in Waterloo, Iowa. He shared the apartment with his girlfriend, Rebecca Worth. Nosko and Worth lived at the apartment for less than two months. Larsie Epps was their neighbor, and they shared a bathroom with her.

Nosko testified that on the evening of March 21, 1998, he and Worth went to Epps' apartment to visit with Epps' granddaughter and to see her granddaughter's baby. After Epps' granddaughter left, the remaining people at her apartment (Nosko, Epps, Worth, and Keith Carey) decided to get something to drink. According to Nosko, he and Carey went to Hy-Vee and purchased a case of beer and a bottle of hard liquor. When they returned to Epps' apartment, Nosko drank two beers and had a shot of liquor. Nosko testified that the alcohol made him sick. After becoming sick, Nosko returned to his apartment to rest.

About ten minutes after Nosko had returned to his apartment, Worth also returned to the apartment and told him that she was going out with Epps in order to find Epps' son-in-law, because Epps wanted to get some money from him. Worth then changed her clothes and left.

Nosko testified that later in the evening, he heard the television from Epps' apartment. Nosko got up and went to the bathroom and heard Worth say: "Give me $5

13

and I'll walk with you arm-in-arm."[11]  Nosko testified that he became jealous when he heard Worth make that statement and thought she was planning to go out again. He opened Epps' apartment door with his foot and told Worth: "You're not going nowhere. You're coming home."[12]  Nosko then returned to his apartment.

Almost immediately after he returned to his apartment, Nosko could hear Redd and Johnson trying to move Worth away from the door to his apartment. He testified that he heard Redd and/or Johnson say: "Just five seconds. We just want to talk to him for five seconds."[13]  Nosko told Worth to let Redd and Johnson into the apartment for five seconds in order to allow them to tell him what they wanted to say. According to Nosko, when Redd and Johnson entered the apartment, Redd came at him and punched him in the face. Redd also flashed his gun at him and then gave it to Johnson. Johnson pointed the gun at him, but Worth was standing between them. Nosko testified that when Worth moved out of the way, she was pushed onto their bed, and Redd attempted to have sex with her. According to Nosko, he grabbed the gun and he tried to force it out of Johnson's hands. In their struggle for the gun, Nosko and Johnson fell onto the bed. Nosko testified that when he got up, the gun was pointed at him again. Redd had gotten off of Worth, and both Redd and Johnson began beating Nosko in the head.

Nosko testified that Redd and Johnson stopped hitting him and asked him to empty his pockets. He only had 15 to 20 cents in his pockets and he put the change on a coffee table. Redd was angry that Nosko did not have more money. Redd and Johnson then left the apartment.

Nosko testified that he tried to lock the door to his apartment, but could not get the door locked. Nosko decided to exit his apartment through the window. He jumped out

---

[11]  *See* Trial Transcript, p. 298, l. 14-15.

[12]  *See* Trial Transcript, p. 298, l. 21-22.

[13]  *See* Trial Transcript, p. 301, l. 21-22.

of the window and told Worth to jump out as well; however, she was unable to jump because someone grabbed her. Nosko then saw Johnson running toward him, and he ran away from his apartment and went to a house about a block away. Nosko testified that he knocked on the door of the house and asked the people to call 911. They called 911 and a police officer arrived about fifteen minutes later. Nosko returned to his apartment with the police officer. At the apartment, Nosko calmed Worth down and they were both taken to the hospital and then to the police station to give their statements about what had taken place that evening.

## IV. STANDARDS OF REVIEW

"A state prisoner may seek a writ of habeas corpus in federal court if his [or her] confinement violates the federal Constitution or federal law." *Weaver v. Bowersox*, 241 F.3d 1024, 1029 (8th Cir. 2001) (citing 28 U.S.C. § 2254(a)). "Federal courts are 'bound by the AEDPA[14] to exercise only limited and deferential review of underlying state court decisions' in habeas corpus cases." *Ryan v. Clarke*, 387 F.3d 785, 790 (8th Cir. 2004) (quoting *Jones v. Luebbers*, 359 F.3d 1005, 1011 (8th Cir. 2004)); *see also* 28 U.S.C. § 2254.[15] Federal habeas corpus relief may only be granted if one or both of two conditions is satisfied. *Ryan*, 387 F.3d at 790. These two conditions are set forth in 28 U.S.C. § 2254(d); which provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was

---

[14] AEDPA is an acronym for the Antiterrorism and Effective Death Penalty Act.

[15] AEDPA amended the federal habeas corpus statute, 28 U.S.C. § 2254, in 1996. *See Williams v. Taylor*, 529 U.S. 362, 399, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). The amendment "placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." *Id.*; *see also Bell v. Cone*, 535 U.S. 685, 693, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) ("The [AEDPA] of 1996 modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law.").

> adjudicated on the merits in State court proceedings unless the
> adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

Thus, "[28 U.S.C. §] 2254(d) distinguishes between two types of erroneous decisions—those of law and those of fact—and treats each in separate subparagraphs." *Weaver*, 241 F.3d at 1029. Claims of legal error are governed by the first subparagraph, and claims of factual error fall within the second subparagraph. *Id.* at 1029-30.

### A. Standard of Review under 28 U.S.C. § 2254(d)(1)

"A federal court may grant a state habeas petitioner relief for a claim that was adjudicated on the merits in state court only if that adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003) (per curiam) (quoting 28 U.S.C. § 2254(d)(1)); *accord Jeremiah v. Kemna*, 370 F.3d 806, 809 (8th Cir. 2004). The Supreme Court's opinion in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000), explains the meaning of those statutory concepts and the degree of deference that must be afforded to state court determinations on the merits. *See Bucklew v. Luebbers*, 436 F.3d 1010, 1015-16 (8th Cir. 2006); *Siers v. Weber*, 259 F.3d 969, 972-73 (8th Cir. 2001).

Under *Williams*, a state court decision can be "contrary to" Supreme Court precedent in one of two ways: (1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or (2) "if the state court confronts [a set of] facts that are materially indistinguishable from a [decision of the

Supreme Court] and [nevertheless] arrives at a result [different from that precedent]."
*Williams*, 529 U.S. at 405-06; *see also Bucklew*, 436 F.3d at 1016 (discussing the "contrary to" prong of *Williams*). Further, "the [statutory] phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

An "unreasonable application" of Supreme Court precedent can also arise in one of two ways. The Supreme Court explained:

> First, a state-court decision involves an unreasonable application of [the Supreme Court's] precedent if the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of [the Supreme Court's] precedent if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Id.* at 407 (citation omitted). Thus, where a state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," that decision "certainly would qualify as a decision 'involving an unreasonable application of . . . clearly established federal law.'" *Id.* at 407-08; *see also Rompilla v. Beard*, 545 U.S. 374, 380, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) (citations omitted) (discussing the "unreasonable application" prong of *Williams*); *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (citations omitted) (same); *Bucklew*, 436 F.3d at 1016 (citations omitted) (same); *James v. Bowersox*, 187 F.3d 866, 869 (8th Cir. 1999) ("An 'unreasonable application' is one that, 'evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent.' *Long v. Humphrey*, 184 F.3d 758, [760] (8th Cir. 1999)"). Additionally,

17

> [u]nder [28 U.S.C.] § 2254(d)(1)'s 'unreasonable application'
> clause, . . . a federal habeas [corpus] court may not issue the
> writ simply because that court concludes in its independent
> judgment that the relevant state-court decision applied clearly
> established federal law erroneously or incorrectly. Rather,
> that application must also be *unreasonable*.

*Williams*, 529 U.S. at 411(emphasis added).

Applying these standards to the present case, the court's inquiry must be whether the Iowa courts reached a decision contrary to that reached by the Supreme Court on a question of law, or alternatively, whether the Iowa courts correctly identified the applicable principles of federal law and then unreasonably applied that law to the facts of Johnson's claims. *See, e.g. Rousan v. Roper*, 436 F.3d 951, 955-56 (8th Cir. 2006) (discussing the applicable standards); *Bucklew*, 436 F.3d at 1016 (same); *Siers*, 259 F.3d at 973 (same).

## B. *Standard of Review under 28 U.S.C. § 2254(d)(2)*

Federal habeas corpus relief "may be granted on a claim adjudicated in state court if the state court proceeding 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Beck v. Bowersox*, 257 F.3d 900, 901 (8th Cir. 2001) (quoting 28 U.S.C. § 2254(d)(2)). The state court findings of fact are presumed to be correct. *Id.* (citing 28 U.S.C. § 2254(e)(1)).[16] The burden is on the applicant to rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Accordingly, the court's review presumes that the Iowa courts found the facts correctly unless Johnson rebuts that

---

[16] 28 U.S.C. § 2254(e)(1) provides:

> In a proceeding instituted by an application for a writ of
> habeas corpus by a person in custody pursuant to the judgment
> of a State court, a determination of a factual issue shall be
> presumed correct. The applicant shall have the burden of
> rebutting the presumption of correctness by clear and
> convincing evidence.

presumption with clear and convincing evidence. *See id.; see also Middleton v. Roper*, 455 F.3d 838, 845 (8th Cir. 2006) ("[The court] bestow[s] a presumption of correctness on the factual findings of the state courts, and absent procedural error, [the court] may set such findings aside only if they are not fairly supported by the record." (quotation and citation omitted)); *Weaver*, 241 F.3d at 1030 ("[O]n habeas [corpus] review, we accord state trial courts broad latitude in determining questions of fact by virtue of the statutory presumption in favor of state court fact-findings . . ."). "It bears repeating that even erroneous fact-finding by the [state] courts will not justify granting a writ if those courts erred 'reasonably.'" *Weaver*, 241 F.3d at 1030.

## C. Exhaustion Requirement

An applicant, before obtaining federal habeas corpus review of his or her state confinement, must first "exhaust" his or her federal claims in the appropriate state forum. 28 U.S.C. § 2254(b)(1);[17] *see also Coleman v. Thompson*, 501 U.S. 722, 731, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991) (citations omitted) ("[A] state prisoner's federal habeas petition should be dismissed if the prisoner has not exhausted available state remedies as to any of his federal claims."); *Clay v. Norris*, 485 F.3d 1037, 1039 (8th Cir. 2007) (same, quoting *Coleman*). An applicant has exhausted his or her state remedies when he or she has provided the highest state court with a full and fair opportunity to consider all the claims before presenting them to the federal court. *Vasquez v. Hillery*, 474 U.S. 254, 257, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986); *Anderson v. Harless*, 459 U.S. 4, 6, 103

---

[17] 28 U.S.C. § 2254(b)(1) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that-
>
> (A) the applicant has exhausted the remedies available in the courts of the State, or
>
> (B) (i) there is an absence of available State corrective process; or
>
>     (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

S. Ct. 276, 74 L. Ed. 2d 3 (1982); *Picard v. Connor*, 404 U.S. 270, 276, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971); *Miller v. Lock*, 108 F.3d 868, 871 (8th Cir. 1997); *Ashker v. Leapley*, 5 F.3d 1178, 1179 (8th Cir. 1993); *McDougald v. Lockhart*, 942 F.2d 508, 510 (8th Cir. 1991); *see also* 28 U.S.C. § 2254(c).[18] In Iowa, exhaustion requires an applicant to seek discretionary review from the Iowa Supreme Court after the Iowa Court of Appeals rejects an appeal argument. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999) (abrogating *Dolny v. Erickson*, 32 F.3d 381 (8th Cir. 1994)); *Randolph v. Kemna*, 276 F.3d 401, 403 (8th Cir. 2002).

In order to satisfy the fair presentment component of the exhaustion requirement, an applicant must: "'refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue.'" *Middleton*, 455 F.3d at 855 (quoting *Abdullah v. Groose*, 75 F.3d 408, 412 (8th Cir. 1996)); *see also Ashker*, 5 F.3d at 1179. A claim is not fairly presented to the state courts unless the same factual grounds and legal theories asserted in the applicant's federal habeas corpus application have been properly raised in his or her state court proceedings. *Keithley v. Hopkins*, 43 F.3d 1216, 1217 (8th Cir. 1995); *Flieger v. Delo*, 16 F.3d 878, 884 (8th Cir. 1994); *see also Harless*, 459 U.S. at 6 ("[T]he habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his [or her] federal habeas corpus claim."); *Picard*, 404 U.S. at 276 (an applicant is required to "present the state courts with the same claim he [or she] urges upon the federal courts."); *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) ("Presenting a claim that is

---

[18] 28 U.S.C. § 2254(c) provides:

> An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he [or she] has the right under the law of the State to raise, by any available procedure, the question presented.

merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement.").

"[The] exhaustion of state remedies requires that petitioners 'fairly present' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (per curiam) (quotations omitted; citing *Picard*, 404 U.S. at 275). If an applicant has not fully presented his or her federal claims in state court, the claims are barred in federal court and must be dismissed, unless the applicant can either show both good cause for his or her failure to present the claims in state court and actual prejudice as a result of the alleged constitutional violation or demonstrate that failure to review the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *Keithley*, 43 F.3d at 1218; *Maynard v. Lockhart*, 981 F.2d 981, 984 (8th Cir. 1992); *Stanley v. Lockhart*, 941 F.2d 707, 709 (8th Cir. 1991).

## V. DISCUSSION

### A. Ineffective Assistance of Counsel

Johnson's initial arguments assert ineffective assistance of trial counsel. First, Johnson claims counsel was ineffective in failing to properly object to Rebecca Worth's testimony regarding statements made by Troy Redd. Second, Johnson argues trial counsel should have claimed prosecutorial misconduct.

The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 684, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Thus, "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *United States v. Cronic*, 466 U.S. 648, 658, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). A criminal defendant also has the right to the effective assistance of counsel on direct appeal. *Roe v. Flores-Ortega*, 528 U.S. 470, 482, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000) (citing *Penson v. Ohio*, 488 U.S. 75, 88-89, 109

S. Ct. 346, 102 L. Ed. 2d 300 (1988)); *Rogers v. United States*, 1 F.3d 697, 700 (8th Cir. 1993) ("'A criminal defendant is entitled to effective assistance of counsel on first appeal as of right.' *Estes v. United States*, 883 F.2d 645, 648 (8th Cir. 1989)."). Furthermore, "[a]bsent some effect of challenged conduct on the reliability of the . . . process, the Sixth Amendment guarantee is generally not implicated." *Cronic*, 466 U.S. at 658 (citations omitted).

In order to establish a claim of ineffective assistance of counsel, Johnson must show that (1) the performance of his trial counsel and appellate counsel was constitutionally deficient, which requires a showing that his counsel's performance fell below an objective standard of reasonableness, and (2) the deficiency in his counsel's performance resulted in prejudice to his defense. *Strickland*, 466 U.S. at 687; *see also Wiggins*, 539 U.S. at 521; *Link v. Luebbers*, 469 F.3d 1197, 1202 (8th Cir. 2006); *Winfield v. Roper*, 460 F.3d 1026, 1033 (8th Cir. 2006); *Middleton*, 455 F.3d at 846. If Johnson makes an insufficient showing on one of the two components, the court is not required to address the other component. *Strickland*, 466 U.S. at 697.

The performance inquiry requires a determination of whether counsel's assistance was "reasonable considering all of the circumstances." *Strickland*, 466 U.S. at 688. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Therefore, a strong presumption exists that counsel's conduct "falls within the wide range of reasonable professional assistance." *Id.*; *see also Link*, 469 F.3d at 1202 (discussing the presumption); *Middleton*, 455 F.3d at 846 (same). Thus, "the defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986) (citation omitted).

Under the prejudice prong, Johnson must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Winfield*, 460 F.3d at 1033 (discussing the prejudice prong). "A reasonable probability, is a probability sufficient to undermine confidence in the outcome." *Id.* However, the prejudice determination is not only concerned with the outcome of the trial or appeal, but also with a determination of whether the result of the proceeding was fundamentally unfair or unreliable. *See Lockhart v. Fretwell*, 506 U.S. 364, 368-70, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him [or her]." *Id.* at 372.[19] The court must consider the totality of the evidence when making the prejudice determination. *Strickland*, 466 U.S. at 695.

## 1. Ineffective Assistance—Statements of Troy Redd

Johnson argues that counsel for his second trial provided ineffective assistance because he did not properly object to statements made by Redd which were introduced by Worth during her trial testimony.[20]

---

[19] In a concurring opinion, Justice O'Connor pointed out that the decision in *Lockhart* "will, in the vast majority of cases, have no effect on the prejudice inquiry under *Strickland*." *Lockhart*, 506 U.S. at 373 (concurrence).

[20] Johnson focuses on the following statements attributed to Redd by Worth in her trial testimony:

> (1) "Do not yell, do not scream. I'm not playing with you." (Said upon arriving at Epps' apartment.)
>
> (2) "We'll kill you and your boyfriend. You guys don't mean anything to us." (Said after entering Epps' apartment.)
>
> (3) Worth testified that Redd told her to shut up, "that he would shoot me, that I did not mean anything." (Said after Worth and Johnson had sex.)
>
> (4) "And here's five bucks here. You can't say we raped you." (Said after Worth and Johnson had sex.)
>
> (5) "You know, if there's any problems, we're going to shoot both you and
> (continued...)

23

Prior to the beginning of Johnson's second trial, his attorney filed a motion in limine and argued that statements made by Redd should not be admitted at the trial because they were hearsay and prejudicial to Johnson. The Iowa District Court for Black Hawk County reserved ruling on the issue until the time of trial. During the trial, Johnson's attorney objected on several occasions to Worth's testimony regarding statements made by Redd. The trial Court overruled Johnson's objections. At the end of Worth's testimony, Johnson's attorney moved for a mistrial, and argued that Worth's testimony regarding Redd's statements constituted hearsay, prejudiced Johnson, and lacked the proper foundation. The trial judge denied Johnson's motion for a mistrial.

In his application for habeas corpus relief, Johnson argues that his counsel's performance was deficient because he did not utilize the Sixth Amendment Confrontation Clause to exclude Redd's statements. Johnson also argues that the State failed to adequately lay the proper foundation to admit Redd's statements in furtherance of a conspiracy pursuant to IOWA R. EVID. 5.801(d)(2)(E) as an exception to hearsay.[21]

---

[20](...continued)

> [Nosko], your boyfriend." (Said before going to Worth and Nosko's apartment.)

[21] Johnson relies on *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999) and *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980) (abrogated by *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)) for his Sixth Amendment Confrontation Clause argument. In *Lilly*, three men were involved in several robberies and a homicide over a two day span in December of 1995. 527 U.S. at 120. The three men were arrested late in the evening on December 5, 1995 and were each questioned separately by the police in the early morning hours of December 6, 1995. *Id.* One of the men, Mark Lilly ("Mark"), stated that his brother, Benjamin Lilly ("Benjamin"), was the mastermind behind the robberies and committed the homicide. *Id.* at 121. Mark was called as a witness to testify at Benjamin's murder trial. *Id.* Mark invoked his Fifth Amendment privilege against self-incrimination, and the Commonwealth offered to introduce into evidence Mark's statements to the police following his arrest. *Id.* Benjamin objected to Mark's statements as a violation of the Confrontation Clause of the Sixth Amendment. *Id.* at 121-22. The trial judge overruled
(continued...)

Johnson's argument is without merit because Worth's testimony regarding Redd's statements was not hearsay. Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." IOWA R. EVID. 5.801(c); *see also United States v. Amahia*, 825 F.2d 177, 181 (8th Cir. 1987) (Under FED. R. EVID. 801(c), which is identical to IOWA R. EVID. 5.801(c), "[a] statement not offered to prove the truth of the matter asserted is not hearsay. . . ."). Worth's testimony regarding Redd's statements was not offered to prove the truth of the matter asserted, but rather was merely offered to show that the statements were made and to complete the story of the crime on trial. "A verbal act is a statement which has an independent legal significance. Even though it would be inadmissible hearsay if offered to prove the truth of any definitive matter asserted therein, it is nevertheless admissible when offered to show merely the statement was made. That is,

---

[21](...continued)

Benjamin's objection and allowed the tape recordings and written transcripts of Mark's statements into evidence. *Id.* at 122. In a plurality opinion, the Supreme Court found that the admission of Mark's statements at trial violated Benjamin's Confrontation Clause rights because the confession of an accomplice that inculpates a criminal defendant is not within a firmly rooted exception to the hearsay rule as defined in Confrontation Clause jurisprudence. *Id.* at 134.

Johnson argues that the principle of *Lilly* applies to Redd's statements. Specifically, Johnson argues that the State is required to show that the hearsay evidence "falls within a firmly rooted exception." *See Roberts*, 448 U.S. at 66. Johnson maintains that *Roberts* is applicable because *Crawford* did not abrogate *Roberts* as to nontestimonial hearsay such as Redd's statements. *See Ferguson v. Roper*, 400 F.3d 635, 639 (8th Cir. 2005) (pre-*Crawford* decisions apply to nontestimonial hearsay on a Confrontation Clause claim). Johnson asserts that Redd's statements do not fall within a firmly rooted hearsay exception. Specifically, Johnson argues that the State failed to lay the adequate foundation to admit Redd's statements in furtherance of a conspiracy pursuant to IOWA R. EVID. 5.801(d)(2)(E). Johnson contends that his trial attorney rendered deficient performance because "he failed to utilize the controlling case law, and make objections to . . . Redd's hearsay statements. If [he] had understood the interplay between the [Sixth] Amendment, and the hearsay rule, he could have excluded . . . Redd's statements." *See* Petitioner's Merits Brief at 36.

it is admissible when offered for purposes of its independent legal significance." *State v. Shortridge*, 589 N.W.2d 76, 82 (Iowa Ct. App. 1998) (citing *Brown v. Iowa Legislative Council*, 490 N.W.2d 551, 554 (Iowa 1992)); *see also State v. Rush*, 242 N.W.2d 313, 319 (Iowa 1976) ("The statement may have been 'admissible as necessary to complete the story of the crime on trial, the acts being so closely related in point of time and place and so intimately associated with each other they form part of the whole transaction.' *State v. Hinkle*, 229 N.W.2d 744, 748-49 (Iowa 1975)"). Because Worth's testimony regarding Redd's statements were not offered to prove the truth of the matter asserted, Redd's statements do not constitute inadmissible hearsay.

Furthermore, even if Redd's statements were hearsay, Johnson's trial attorney did not provide ineffective assistance because his performance was not deficient. An attorney's performance is deficient if his or her representation is unreasonable under prevailing professional norms. *Kimmelman*, 477 U.S. at 381. There is also a strong presumption that counsel's conduct "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Here, Johnson's counsel objected to Redd's statements as hearsay and prejudicial to Johnson in a motion in limine argued before trial commenced, orally during Worth's trial testimony, and in a motion for mistrial at the conclusion of Worth's testimony. Thus, Johnson's counsel represented him in a reasonable manner under prevailing professional norms.

Moreover, applying the deferential standard of review set forth in 28 U.S.C. § 2254(d)(1), the Iowa Court of Appeals did not unreasonably apply *Strickland* when it concluded that Johnson was not prejudiced by his counsel's assistance. Specifically, the Iowa Court of Appeals determined that even if Johnson's trial counsel failed to timely and correctly object to statements made by Redd and introduced by other witnesses, Johnson did not prove he was prejudiced by his counsel's conduct because, "[b]ased on the strength of the State's case . . . [, there was] no reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *State v.*

*Johnson*, No. 01-0889, 2003 WL 118212 (Iowa Ct. App. 2003) at **4-5 (citation omitted). For the foregoing reasons, Johnson is not entitled to relief on this ground.

## 2. *Ineffective Assistance—Prosecutorial Misconduct*

"As a general rule, prosecutorial misconduct does not merit federal habeas relief unless the misconduct infected the trial with enough unfairness to render [a] petitioner's conviction a denial of due process." *Stringer v. Hedgepeth*, 280 F.3d 826, 829 (8th Cir. 2002) (citation and quotation omitted); *see also Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (The relevant question for determining whether a prosecutor's comments constitute a violation of due process "is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)."); *Underdahl v. Carlson*, 462 F.3d 796, 800-01 (8th Cir. 2006) (applying *Darden*); *Clemons v. Luebbers*, 381 F.3d 744, 757 (8th Cir. 2004) (same). In order to constitute a due process violation, "improper remarks by a prosecutor must be 'so egregious that they fatally infect the proceedings and render a defendant's entire trial fundamentally unfair.'" *Stringer*, 280 F.3d at 829 (quoting *Moore v. Wyrick* 760 F.2d 884, 886 (8th Cir. 1985)). Relief may only be granted if the applicant demonstrates a "'reasonable probability that the error complained of affected the outcome of the trial—i.e., that absent the alleged impropriety the verdict probably would have been different.'" *Id.* (quoting *Anderson v. Goeke*, 44 F.3d 675, 679 (8th Cir. 1995)); *see also Clemons*, 381 F.3d at 757 ("Relief is available only if 'the prosecutor's closing argument was so inflammatory and so outrageous that any reasonable trial judge would have *sua sponte* declared a mistrial.' *James v. Bowersox*, 187 F.3d 866, 869 (8th Cir. 1999)").

### a. *Prosecutor's closing argument.*

Johnson argues that his trial counsel provided ineffective assistance by failing to move for a mistrial based upon misconduct by the prosecutor during his closing argument. Johnson asserts two instances of prosecutorial misconduct. First, he argues that the

27

prosecutor improperly provided his personal opinion when he informed the jury that the county attorney's office believed Worth had been raped by Johnson on March 21, 1998.[22] Second, Johnson argues that the prosecutor improperly injected race into his closing argument by implying that Epps was not a credible witness and was protecting Johnson because they were both African-Americans and she would have to "go back into the community" after she testified.[23] Johnson assumes that "to go back into the community" refers to the "black community."

Respondent argues that Johnson's counsel was not ineffective for failing to move for a mistrial based on prosecutorial misconduct. Respondent replies to both instances of prosecutorial misconduct alleged by Johnson. First, Respondent asserts that the prosecutor's remarks regarding Worth's rape claim were "invited" as a response to defense

---

[22] During his closing argument, the prosecutor made the following statement:

Why didn't we file the rape charges? Because one of the things we were having to deal with was [Epps]. Two is we have to deal with the fact that there was alcohol use in [Epps' apartment]. Three is we have to deal with the dress, and the spiked heels, and going out late at night. That's what we've got to deal with. And let's not forget, we have to deal with [Nosko's] own reaction when he looked in that apartment and saw [Worth] with those two men [Johnson and Redd]. Even her own boyfriend.

And so we have to bring a case like that, a rape case, to prove to you folks beyond a reasonable doubt that she was raped? No. The State, the County Attorney's Office, believes she was.

See Trial Transcript at p. 456, l. 25 - p. 457, l. 12.

[23] The prosecutor made the following statement during his closing argument:

And I submit to you, you didn't get the whole truth and nothing but the truth from [Epps], because she knows what it is to come in here in full view of people and testify and then have to turn around and go back out in the community.

See Trial Transcript at p. 423, l. 24 - p. 424, l. 3.

counsel's statement in his closing argument that Johnson was not charged with rape because the investigating officers or the county attorney's office did not believe Worth's rape allegation.[24] Second, Respondent argues that the prosecutor's alleged injection of race into his closing argument by implying Epps was not a credible witness because she would have to "go back into the community," was not a "thinly veiled racial reference" because Johnson's assumption that "community" meant the "black community" was unwarranted. Respondent suggests that "'community' . . . could just as well have referred to the community of Epps' friends and acquaintances, based on the assumption that testifying against one's friends in a criminal trial may cause friction with other common friends and acquaintances."[25] Lastly, Respondent argues that, under *Strickland*, Johnson was not prejudiced by either instance of alleged prosecutorial misconduct; and therefore, is not entitled to habeas corpus relief.

---

[24] In his closing argument, Johnson's counsel stated:

> Ladies and gentlemen, you've heard instructions for robbery, burglary. They have instructions for sexual assault. It's a crime. And, ladies and gentlemen, you probably have a question in the back of your mind, why isn't Mr. Johnson charged with sexually assaulting Rebecca Worth? Why? Why aren't we considering that? Why don't we have an instruction on that to take back with us to the deliberation room? Why, ladies and gentlemen? Because Mr. Johnson wasn't charged with that.
>
> You may ask yourself another question: Why isn't Mr. Johnson charged with that? The answer, ladies and gentlemen, is because either the investigating officers or the County Attorney's Office did not believe her story. That's why. In fact, ladies and gentlemen, this whole case begins as an investigation of sexual assault. And that's dropped.

*See* Trial Transcript at p. 436, l. 20 - p. 437, l. 10.

[25] *See* Respondent's Brief at 21.

### i. Worth's rape allegation.

"A prosecutor 'is entitled to make a fair response and rebuttal' if he [or she] or government agents or witnesses are attacked." *United States v. Davis*, 417 F.3d 909, 912 (8th Cir. 2005) (quoting *United States v. Williams*, 97 F.3d 240, 246 (8th Cir. 1996)). Rebuttal comments made by a prosecutor to "right the scale" following remarks made by a defendant's counsel in his or her closing arguments should be viewed within the context of the entire trial in order to determine whether the prosecutor's response deprived a defendant of a fair trial. *United States v. Young*, 470 U.S. 1, 11-13, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985); *Davis*, 417 F.3d at 912. "In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly." *Young*, 470 U.S. at 12. Thus, the defense counsel's conduct and the prosecutor's response is relevant for making such a determination. *Id*. Furthermore, the "issue is not the prosecutor's license to make otherwise improper arguments, but whether the prosecutor's 'invited response,' taken in context, unfairly prejudiced the defendant." *Id*.

Having reviewed defense counsel's statements in his closing argument and the prosecutor's rebuttal statements, the Court concludes that Johnson was not unfairly prejudiced. The Iowa Court of Appeals pointed out that the record in this case contains overwhelming evidence of Johnson's guilt to the offenses charged. *See State v. Johnson*, No. 01-0889, 2003 WL 118212 (Iowa Ct. App. 2003) at *4. The existence of "overwhelming evidence" of a defendant's guilt is a factor for determining whether prosecutorial misconduct had a seriously prejudicial effect on a trial. *United States v. Hernandez*, 779 F.2d 456, 460-61 (8th Cir. 1985) (citing *Young*, 470 U.S. at 20; *United States v. Hasting*, 461 U.S. 499, 512, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983)). Because the record contains overwhelming evidence of Johnson's guilt, his verdict would not have been different, even if the prosecutor had not made his remarks during rebuttal. *Stringer*, 280 F.3d at 829.

Furthermore, applying the deferential standard of review set forth in 28 U.S.C. § 2254(d)(1), the Iowa Court of Appeals did not unreasonably apply *Strickland* when it concluded that Johnson was not prejudiced by his counsel's assistance. Specifically, the Iowa Court of Appeals determined that, even if Johnson's trial counsel failed to move for a mistrial due to prosecutorial misconduct, Johnson did not prove he was prejudiced by his counsel's conduct because, "[b]ased on the strength of the State's case . . . [, there was] no reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *State v. Johnson*, No. 01-0889, 2003 WL 118212 (Iowa Ct. App. 2003) at **4-5 (citation omitted). Accordingly, Johnson is not entitled to relief on this ground.

### ii. Credibility of Larsie Epps as a witness.

The prosecutor's statement "you didn't get the whole truth and nothing but the truth from [Epps], because she knows what it is to come in here in full view of people and testify and then have to turn around and go back out in the community" is not so egregious that Johnson's entire trial was fundamentally unfair. *See Moore*, 760 F.2d at 886. Furthermore, applying the deferential standard of review set forth in 28 U.S.C. § 2254(d)(1), the Iowa Court of Appeals did not unreasonably apply *Strickland* when it concluded that Johnson was not prejudiced by his counsel's assistance. Specifically, the Iowa Court of Appeals determined that even if Johnson's trial counsel failed to move for a mistrial due to prosecutorial misconduct, Johnson did not prove he was prejudiced by his counsel's conduct because, "[b]ased on the strength of the State's case . . . [, there was] no reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *State v. Johnson*, No. 01-0889, 2003 WL 118212 (Iowa Ct. App. 2003) at **4-5 (citation omitted). Thus, Johnson is not entitled to relief on this ground.

### b. Prosecutor's use of Larsie Epps as a State witness.

Johnson argues that his trial counsel provided ineffective assistance by failing to object to prosecutorial misconduct relating to the State's use of Epps as a witness. Specifically, Johnson argues that the prosecutor presented testimony he knew was false during Epps' examination, and that she was called with the intention of impeaching her with otherwise inadmissible evidence. Johnson's argument centers on the following question asked by the prosecutor on redirect examination of Epps and the relevant discussion following that question:

| | |
|---|---|
| Q. | All right. Ms. Epps, did you sell Rebecca Worth that night for a rock of cocaine? |
| MR. HOFFEY:[26] | Objection, Your Honor . . . |
| THE COURT: | Wait a minute. I didn't hear. What was the question? |
| . . . | |
| Q. | Did you sell Rebbecca Worth that night for a rock of cocaine to Cletus Johnson? |
| MR. HOFFEY: | Objection, Your Honor. |
| . . | [After the jury was excused.]. |
| THE COURT: | What in the world did that come from? This is the first I've heard anything about that. |
| MR. WALTON:[27] | It came up in the first trial. I asked the question. It comes up from the circumstances of this case, Your Honor. |

---

[26] Mr. Hoffey was Johnson's trial counsel for his second trial.

[27] Mr. Walton was the prosecutor in Johnson's second trial.

. . .

THE COURT: Well, now it's relevant, but I just think it's too prejudicial. It just comes out of nowhere. No, I'm not going to allow you to ask it. I'm going to instruct the jury to disregard it. . . . Ladies and gentlemen of the jury, before we broke a moment ago Mr. Walton asked a question which was objected to, and I have sustained the objection and I'll instruct you that if you heard the question, you'll disregard it and will not consider it at all in your deliberations.[28]

The record demonstrates that Johnson's trial counsel objected to the prosecutor's question regarding whether Epps "sold Worth for a rock of cocaine," and the trial Court sustained trial counsel's objection and instructed the jury to disregard the prosecutor's question. Clearly, defense counsel did what was required of him, and he achieved the result that he desired. Additionally, considering the record and viewing the prosecutor's question in the context of the entire trial, the Court concludes that Johnson was not unfairly prejudiced. The Iowa Court of Appeals pointed out that the record in this case contains overwhelming evidence of Johnson's guilt to the offenses charged. *See State v. Johnson*, No. 01-0889, 2003 WL 118212 (Iowa Ct. App. 2003) at \*4. The existence of "overwhelming evidence" of a defendant's guilt is a factor for determining whether prosecutorial misconduct had a seriously prejudicial effect on a trial. *See Hernandez*, 779 F.2d at 460-61 (citations omitted). Because the record contains overwhelming evidence of Johnson's guilt, Johnson's verdict would not have been different, even if the prosecutor had not asked his question on redirect examination. *Stringer*, 280 F.3d at 829.

Furthermore, applying the deferential standard of review set forth in 28 U.S.C. § 2254(d)(1), the Iowa Court of Appeals did not unreasonably apply *Strickland* when it

---

[28] *See* Trial Transcript at p. 173, l. 9 - p. 175, l. 9.

concluded that Johnson was not prejudiced by his counsel's assistance. Specifically, the Iowa Court of Appeals determined that, even if Johnson's trial counsel failed to object to prosecutorial misconduct, Johnson did not prove he was prejudiced by his counsel's conduct because, "[b]ased on the strength of the State's case . . . [, there was] no reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *State v. Johnson*, No. 01-0889, 2003 WL 118212 (Iowa Ct. App. 2003) at **4-5 (citation omitted). Thus, Johnson is not entitled to relief on this ground.

## B. *Equal Protection Violation—Jury Selection*

Johnson argues that his Fourteenth Amendment right to equal protection was violated because the State struck the only African-American juror from the jury panel, leaving him to face an all-white jury. In *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the Supreme Court set forth a three-part analysis for determining whether peremptory challenges or strikes of potential jurors are exercised impermissibly on the basis of race. The *Batson* analysis places the initial burden on the defendant to establish a prima facie case of discrimination. *Id.* at 96. If the defendant establishes a prima facie case of discrimination, the burden shifts to the State to articulate a race-neutral reason for issuing peremptory challenges or strikes to potential jurors. *Id.* at 97. The third step of the *Batson* analysis requires the trial court to determine whether the defendant established purposeful discrimination. *Id.* at 98; *see also Miller-El v. Cockrell*, 537 U.S. 322, 328-29, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) ("Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination."). Johnson argues that the State offered an insufficiently race-neutral explanation for using its peremptory challenge to strike the sole African-American juror from the jury. Johnson further argues that both the Iowa District Court for Black Hawk County and the Iowa Court of Appeals improperly applied *Batson* because neither court proceeded to step three of the *Batson* analysis.

The prosecutor in this case offered the following explanation for striking Phillip Caldwell, the sole African-American juror, during jury selection:

> The reasons for striking Mr. Caldwell were numerous. First of all, his son, Phillip, was prosecuted by our office [Black Hawk County Attorney's Office] by the State for Possession With Intent to Deliver Cocaine, and Mr. Caldwell had a problem with how the Waterloo Police Department performed in that case.
>
> Second, Mr. Caldwell had a daughter . . . who was also prosecuted by the Black Hawk County Attorney's Office, and my recollection is I prosecuted her. And given that he's had this contact vicariously through his children, it's very serious criminal offenses, I felt I couldn't risk having him view that -- view this case through that experience and perhaps prejudice my own case.
>
> When I look at the other potential jurors that I could have struck, I couldn't find anyone that had more substantial reasons to strike than Mr. Caldwell; and to not strike him would have required me to strike another juror for virtually no reason at all. . . . I did not strike Mr. Caldwell because of his color, I struck [him] because he had that kind of background.
>
> I asked the whole panel whether they had any close friends or loved ones that have ever been in jail or prison. I asked the whole panel that. And so it wasn't just directed at him, it was directed at [everybody]; and anybody that would have had that substantial contact like he had I would have struck.[29]

The trial judge provided the following reason for excusing Mr. Caldwell from the jury:

> [M]y problem is at the very beginning he [Mr. Caldwell] said, "Yes, I had a boy that got in trouble," and he felt the system had not properly handled him. And, frankly, what puzzled me was only later, quite a bit later, that we found out he also had a daughter that just got out of prison yesterday, I thought he said, something like that. And, again, at the beginning he demonstrated some animosity to the system, and later on he -- as more questions were asked, he kind of softened that up.

---

[29] *See* Trial Transcript at p. 11, l. 5 - p. 12, l. 8.

Case 6:05-cv-02081-LRR   Document 38   Filed 07/31/07   Page 35 of 41

> But I have to agree with Mr. Walton [the prosecutor]
> that he carried his burden of showing that he shouldn't sit on
> the jury, and I don't think it would have been proper to let him
> sit just because he's a black when he had all these other
> problems. . . . No, I felt this was a unique situation, and
> that's why I excused him.[30]

The Iowa Court of Appeals determined that the trial court properly excused Mr. Caldwell
as a juror. *State v. Johnson*, No. 01-0889, 2003 WL 118212 (Iowa Ct. App. 2003) at *3.
The Iowa Court of Appeals reasoned:

> The State's proffered race-neutral reason for striking the juror
> was that the juror's son and daughter had both been prosecuted
> by the Black Hawk County Attorney's Office and the juror felt
> his son's case was handled improperly.    The trial court
> correctly excused the juror.

*Id.*

A critical factor for determining whether a defendant has proved purposeful
discrimination at step three of the *Batson* analysis is the "persuasiveness of the
prosecutor's justification for his [or her] peremptory strike." *Miller-El*, 537 U.S. at 338-
39. Justifications which are implausible or fantastic are examples of reasons that may be
found to be pretexts for purposeful discrimination. *Id.* at 339; *Purkett v. Elem*, 514 U.S.
765, 768, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) ("[I]mplausible or fantastic
justifications may (and probably will) be found to be pretexts for purposeful
discrimination."). Thus, the issue becomes whether the trial court found the prosecutor's
race-neutral explanations to be credible. *Miller-El*, 537 U.S. at 339. "Credibility can be
measured by, among other factors, . . . how reasonable, or how improbable, the
explanations are." *Id.* "Deference to trial court findings on the issue of discriminatory
intent makes particular sense in this context because, as . . . noted in *Batson*, the finding
'largely will turn on evaluation of credibility.'" *Hernandez v. New York*, 500 U.S. 352,
365, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (quoting *Batson*, 476 U.S. at 98, n. 21).

---

[30] *See* Trial Transcript at p. 12, l. 12 - p. 13, l. 5.

Furthermore, under habeas corpus jurisprudence, factual determinations by state courts are presumed correct absent clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In this case, the prosecutor's race-neutral reason for striking Mr. Caldwell was neither implausible, nor fantastic. The facts demonstrate that Mr. Caldwell's son and daughter were both prosecuted by the Black Hawk County Attorney's Office and Mr. Caldwell took issue with the manner in which his son's case was handled. Under these facts, it was reasonable for the prosecutor to strike Mr. Caldwell. Furthermore, both the Iowa District Court for Black Hawk County and the Iowa Court of Appeals found the prosecutor's reasons for striking Mr. Caldwell to be reasonable. Therefore, pursuant to 28 U.S.C. § 2254(e)(1), the Court will defer to the findings of the Iowa courts. The Court further finds Johnson's argument that neither the Iowa District Court for Black Hawk County, nor the Iowa Court Appeals applied the third-step of the *Batson* analysis to be without merit. The record clearly demonstrates that both the Iowa trial court and Iowa appellate court considered the prosecutor's justifications for his peremptory strike, and concluded that he was credible and that his proffered justifications were reasonable. *See Miller-El*, 537 U.S. at 338-39. Accordingly, Johnson is not entitled to relief on this ground.

### C. Due Process Violation—Use of Larsie Epps as a State Witness

Johnson argues that the prosecutor's use of Epps as a State witness violated his due process right to a fair trial because the prosecutor knowingly presented Epps' false testimony and called her for the sole purpose of entering inadmissible evidence under the guise of impeachment. Specifically, Johnson argues that the prosecutor's actions constituted misconduct because he called Epps and questioned her regarding the sex he had with Worth and he knew from the first trial that Epps would testify that the sex was consensual even though the State believed that it was not consensual.[31] Johnson further

---

[31] *See* Johnson's Merits Brief at 71 (The prosecutor "subjectively believed that
(continued...)

argues that the prosecutor presented Epps' testimony that he believed was false in order to impeach her by asking her whether she "sold Worth for rock cocaine."[32] Johnson maintains that the prosecutor's actions amounted to the use of perjured testimony to create a false impression of material fact that Epps "sold Worth for rock cocaine."

The Iowa Court of Appeals addressed this issue in *State v. Johnson*, No. 01-0889, 2003 WL 118212 (Iowa Ct. App. 2003) and *State v. Johnson*, No. 04-1486, 2005 WL 1630810 (Iowa Ct. App. 2005). In the 2003 opinion, the Iowa Court of Appeals concluded:

> Where, as here, other evidence overwhelmingly establishes guilt of the offenses charged, any error in admitting evidence of Johnson's prior sexual behavior or prosecutorial misconduct during Epps's [*sic*] redirect examination was harmless as a matter of law.

*State v. Johnson*, No. 01-0889, 2003 WL 118212 (Iowa Ct. App. 2003) at * 4. The Iowa Court of Appeals addressed this issue again in 2005 on Johnson's postconviction appeal. In the 2005 opinion, the Iowa Court of Appeals concluded that its prejudice determination for prosecutorial misconduct was "tantamount to a review to establish whether Johnson was denied a fair trial." *State v. Johnson*, No. 04-1486, 2005 WL 1630810 (Iowa Ct. App. 2005) at * 3. The Iowa Court of Appeals further stated:

> The phrase 'denial of a fair trial' is generally considered to invoke the same basic concepts that inhere in due process of law. Johnson provides no authority as to why 'conduct not viewed as sufficiently unfair to warrant relief under general principles of a fair trial would have established a right to relief under a constitutional standard of due process. Absent such authority it will not be presumed that conduct found harmless

---

[31](...continued)

Worth was raped, and [he knew] that Ms. Epps was going to testify that Worth was not raped because he already heard her testimony from the first trial.").

[32] *See* discussion at C.2 above.

as a matter of law and otherwise non-prejudicial could warrant
relief when challenged as a violation of due process.

*Id.*

The Iowa Court of Appeals, on two occasions, determined that Johnson received
a fair trial, and was not prejudiced by any prosecutorial misconduct with regard to the
prosecutor's redirect examination of Epps because the evidence in the case overwhelmingly
established his guilt of the offenses charged. *See State v. Johnson*, No. 04-1486, 2005
WL 1630810 (Iowa Ct. App. 2005) at * 3; *State v. Johnson*, No. 01-0889, 2003
WL 118212 (Iowa Ct. App. 2003) at * 4. The existence of "overwhelming evidence" of
a defendant's guilt is a factor for determining whether prosecutorial misconduct had a
seriously prejudicial effect on a trial. *See Young*, 470 U.S. at 20; *Hasting*, 461 U.S. at
512; *Hernandez*, 779 F.2d at 460-61. Because the record contains overwhelming evidence
of Johnson's guilt, his verdict would not have been different, even absent any misconduct
by the prosecutor. *Stringer*, 280 F.3d at 829. Furthermore, applying the deferential
standard of review set forth in 28 U.S.C. § 2254(d)(1), the Iowa Court of Appeals did not
unreasonably apply Supreme Court precedent when it determined that Johnson was not
prejudiced by prosecutorial misconduct. Accordingly, Johnson is not entitled to relief on
this ground.

## VI. CERTIFICATE OF APPEALABILITY

In a habeas proceeding before a district judge, the final order shall be subject to
review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
*See* 28 U.S.C. § 2253(a). Unless a circuit justice or judge issues a certificate of
appealability, an appeal may not be taken to the court of appeals. *See* 28 U.S.C.
§ 2253(c)(1)(A). A district court possesses the authority to issue certificates of
appealability under 28 U.S.C. § 2253(c) and FED. R. APP. P. 22(b). *See Cox v. Norris*,
133 F.3d 565, 569 (8th Cir. 1997); *Tiedeman v. Benson*, 122 F.3d 518, 522 (8th Cir.
1997). Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may only issue if an
applicant has made a substantial showing of the denial of a constitutional right. *See Miller-*

*El*, 537 U.S. at 335-36; *Winfield*, 460 F.3d at 1040 (8th Cir. 2006); *Williams v. United States*, 452 F.3d 1009, 1014 (8th Cir. 2006); *Williams v. Bruton*, 299 F.3d 981, 982 (8th Cir. 2002); *Garrett v. United States*, 211 F.3d 1075, 1076-77 (8th Cir. 2000); *Tiedeman*, 122 F.3d at 523. To make such a showing, the issues must be debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings. *Winfield*, 460 F.3d at 1040; *Cox*, 133 F.3d at 569 (citation omitted); *see also Tennard v. Dretke* 542 U.S. 274, 276, 124 S. Ct. 2562, 159 L. Ed. 2d (2004) (reiterating standard); *Miller-El*, 537 U.S. at 335-36 (same).

Courts reject constitutional claims either on the merits or on procedural grounds. "'[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy [28 U.S.C.] § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Miller-El*, 537 U.S. at 338 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000)). When a federal habeas petition is dismissed on procedural grounds without reaching the underlying constitutional claim, "the [applicant must show], at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

Having thoroughly reviewed the record in this case, the Court finds that Johnson failed to make the requisite "substantial showing" with respect to the claims that he raised in his application pursuant to 28 U.S.C. § 2254. See 28 U.S.C. § 2253(c)(2); FED. R. APP. P. 22(b). Because there is no debatable question as to the resolution of this case, an appeal is not warranted. Accordingly, the Court recommends that a certificate of appealability pursuant to 28 U.S.C. § 2253 not be granted.

## VII. CONCLUSION

In sum, Johnson is not entitled to relief pursuant to 28 U.S.C. § 2254. The Iowa courts' adjudication of Johnson's claims neither resulted in a decision contrary to, or involving an unreasonable application of, clearly established federal law, nor resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, the Court recommends that Johnson's application for a writ of habeas corpus be denied. The Court also recommends that a certificate of appealability be denied.

## VIII. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the District Court DENY Johnson's application for a writ of habeas corpus and DENY a certificate of appealability.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1)(B), that within ten (10) days after being served with a copy of these proposed findings and recommendations, any party may serve and file written objections with the District Court.

DATED this 30th day of July, 2007.

JON STUART SCOLES
United States Magistrate Judge
NORTHERN DISTRICT OF IOWA

41